## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Christina Hildonen and Joan Whitaker, as representatives of a class of similarly situated persons, and on behalf of the Action for Boston Community Development Tax Sheltered Annuity Plan,<br><br>Plaintiffs,<br><br>v.<br><br>Action for Boston Community Development, Inc.,<br><br>Defendant. | Case No.<br><br><br>**CLASS ACTION COMPLAINT** |

### INTRODUCTION

1.     Plaintiffs Christina Hildonen and Joan Whitaker ("Plaintiffs"), on behalf of the Action for Boston Community Development Tax Sheltered Annuity Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act ("ERISA") against Defendant Action for Boston Community Development, Inc. ("ABCD").

2.     The Plan is ABCD's contributory retirement plan for employees. Plan benefits are limited to the sum of contributions and investment earnings. This case is about the Plan's investment earnings, which are among the lowest in the country due to ABCD's imprudence.

3.     ABCD directed 100% of participant accounts under its control to a capital preservation fund and never moved those investments, resulting in the Plan holding more than 55% of its total assets in a capital preservation fund to this day. The norm among peer plans is 15%–20% in capital preservation assets. The Plan's overallocation to capital preservation has resulted in plan-wide returns that are worse than more than 99% of comparable plans, causing ABCD employees as a group to earn millions less per year in income and gains because they

1

happen to work for ABCD and not another employer.

4.      There is nothing about ABCD's employee demographics to justify such a stark deviation from investment norms. The Plan's earning deficits are the result of ABCD's lack of diligence and care in managing retirement investments for its employees.

5.      ABCD violated ERISA, 29 U.S.C. § 1104(a)(1), by failing from 2019 to the present to remedy its misallocation of Plan assets and bring the Plan's investments in line with prudent asset allocation practices and participants' time horizons and needs, resulting in losses to the Plan recoverable pursuant to 29 U.S.C. §§ 1109 and 1132(a). Plaintiffs brings this case on behalf of the Plan and its participants to recover lost earnings and appropriate equitable relief.

## JURISDICTION AND VENUE

6.      Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a), which provides that participants in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

7.      This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

8.      Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the Plan was administered in this district.

## PARTIES

9.      The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" as defined by 29 U.S.C. § 1002(34) (also known as an "individual account plan"). The Plan qualifies for tax treatment under 26 U.S.C. § 403(b), and is commonly referred to as a "403(b) plan." The Plan was established by ABCD in 1966 to

allow employees to defer compensation and save for retirement. Employees' Plan benefits are limited to the value of their individuals accounts, which is determined by the sum of their contributions and investment earnings. During the last six years, the Plan has had more than 500 participants with account balances and a total of between $40 million and $50 million in assets.

10.     Plaintiff Christina Hildonen is a former ABCD employee. She contributed a portion of her income to her account in the Plan from the time that she starting working for ABCD in 2008 until she left ABCD in 2022, after which time she rolled the balance of her Plan account into an IRA. When Plaintiff Hildonen started participating in the Plan, ABCD dictated that 50% of all her contributions to the Plan were "non-participant directed." This means that Plaintiff Hildonen—and all other participants in the Plan at that time—had no choice in how 50% of their contributions were invested. Instead, ABCD exercised discretion with respect to how the non-participant directed portion of Plaintiff Hildonen's Plan account was invested. ABCD chose to invest 100% of the non-participant directed portion of her account in the Plan's capital preservation fund. ABCD has never moved this investment (other than from one capital preservation fund provider to another in 2019). Plaintiff Hildonen does not know whether she was permitted to reallocate assets in her Plan account that ABCD had previously directed into the fixed account, and does not recall receiving any guidance from ABCD on that topic. Nor does Plaintiff Hildonen recall ever receiving any fee disclosures related to the Plan's investment options or a summary plan description. Plaintiff Hildonen was more than 35 years from retirement when she started working for ABCD and more than 20 years from retirement when she rolled the balance of her account over from the Plan. Her rollover amount would have been higher had ABCD prudently monitored the non-participant directed assets in her account and replaced them with suitable investments appropriate for her investment horizon and needs.

11.      Plaintiff Joan Whitaker is a former ABCD employee. She contributed a portion of her income to her account in the Plan from the time that she starting working for ABCD in the late 1980s until she left ABCD in 2021, after which time she rolled the balance of her Plan account into an IRA. When Plaintiff Whitaker started participating in the Plan, ABCD dictated that all her contributions to the Plan were "non-participant directed." This means that Plaintiff Whitaker— and all other participants in the Plan at that time—had no choice in how their contributions were invested. Instead, ABCD exercised discretion with respect to how Plaintiff Whitaker's Plan account was invested. ABCD chose to invest 100% of her account in the Plan's capital preservation fund. ABCD has never moved this investment (other than from one capital preservation fund provider to another in 2019). Plaintiff Whitaker does not know whether she was permitted to reallocate assets in her Plan account that ABCD had previously directed into the fixed account, and does not recall receiving any guidance from ABCD on that topic. Nor does Plaintiff Whitaker recall ever receiving any fee disclosures related to the Plan's investment options or a summary plan description. Plaintiff Whitaker was more than 30 years from retirement when she started working for ABCD. Her rollover amount would have been higher had ABCD prudently monitored the non-participant directed assets in her account and replaced them with suitable investments appropriate for her investment horizon and needs.

12.      Defendant ABCD is a 501(c)(3) community action agency. ABCD sponsors the Plan to allow employees to save for retirement. According to annual reports filed with the Department of Labor by Plan, ABCD acts as the "administrator" of the Plan and "is responsible for the oversight of the Plan, the appropriateness of the Plan's investment offerings and monitors investment performance." ABCD therefore acts as the Plan's "fiduciary" as defined by ERISA, 29

U.S.C. § 1002(21)(A)(i) & (iii), and owes a duty of prudence to the Plan and its participants pursuant to 29 U.S.C. § 1104(a)(1).

## **DEFENDANT'S VIOLATIONS OF ERISA**

### *The Prudent Investor Rule*

13.     ERISA fiduciaries must follow the "prudent investor rule" adopted from the law of trusts. *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983) ("[The] common law 'prudent investor' rule [was] codified by ERISA.").

14.     Pursuant to the prudent investor rule, fiduciaries must invest plan assets in a manner that is "reasonably designed to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain." 29 C.F.R. § 2550.404a-1(b)(2)(i); *see also* Restatement (Third) of Trusts (2007) (hereinafter "3d Rest.") § 90(a) (fiduciaries must pursue "an overall investment strategy[] which … incorporate[s] risk and return objectives reasonably suitable to the trust").

15.     The prudent investor rule departs from earlier understandings of prudence that overemphasized risk avoidance. *See* 3d Rest. § 90 cmts. a & k ("[T]he prudent investor rule is "an extension and clarification of the traditional … 'prudent man rule,'" pursuant to which "[b]road categories of properties and techniques came to be branded as 'speculative' [and] … classified as 'impermissible'"); *see also id.*, Reporter's Note to cmt. e. (""[S]afety' of the funds invested was often identified as 'the primary object to be obtained by a trustee' under traditional doctrine[.]").

16.     Rather than avoid risk, fiduciaries must manage risk in pursuit of the objectives of the plan. *See* Max M. Schanzenbach, *et al.* "The Prudent Investor Rule and Market Risk: An Empirical Analysis," Journal of Empirical Legal Studies Volume 14, Issue 1, 129:168, 130 (March

2017) ("The prudent investor rule … reorients trust investment from risk avoidance to risk management[.]").[1]

17.    An appropriate investment strategy suited to the objectives of the plan must consider the time horizons and needs of beneficial investors. *See* 29 C.F.R. § 2550.404a-1(b)(4) ("A fiduciary's determination with respect to an investment" must "us[e] appropriate investment horizons consistent with the plan's investment objectives."); *see also* 3d Rest. § 90 cmt. k ("Asset selection … requires sensitivity to the trust's investment time horizons[.]"). A plan's tolerance for risk "largely depends" on how long funds will be held. *Id.* cmt. e(1).

### *The Plan's Objectives and Tolerance for Risk*

18.    Employee retirement plans are generally long-term investments. *See* 72 Fed. Reg. 60452, 60463 (finding that retirement investments made on behalf of employees "ought to and often will be long-term investments").

19.    Employee retirement plan participants are charged a 10% penalty tax to use their accounts before reaching retirement age, in addition to having the entirety of any withdrawal taxed as income. *See* 26 U.S.C. § 72(t). Employee retirement plan participants are encouraged to hold their accounts until retirement by deferral of tax on account contributions and investment earnings. *See* 26 U.S.C. § 501(a). The Plan's participants are no exception and generally refrain from using their account balances until retirement in order to avoid penalties and defer taxes.

20.    The average U.S. worker at any given time is around 20 years or more from retirement age. *See* U.S. Bureau of Labor Statistics. "Employment Projections: Median age of the labor force, by sex, race and ethnicity."[2] In addition, many workers do not liquidate their entire

---

[1] Available at www.aals.org/wp-content/uploads/2018/02/AM17PrudentInvestorRuleandMarketRisk.pdf.

[2] Available at www.bls.gov/emp/tables/median-age-labor-force.htm.

retirement account balances upon reaching retirement age and instead maintain long-term investments during retirement, withdrawing funds as needed. *See* U.S. Department of Labor, "Target Date Retirement Funds - Tips for ERISA Plan Fiduciaries" at 2 (Feb. 2013) (noting that common default investment funds in employee plans are structured for employees to "make periodic withdrawals over the span of their retirement years").[3]

21.    The average U.S. worker is unprepared for retirement. *See* National Institute on Retirement Security, "Statement before the Senate Committee on Health, Education, Labor, and Pensions" at 3 (Feb. 28, 2024) ("The data indicate that most Americans, particularly middle-class workers, are falling far short when it comes to saving enough money for a financially secure retirement.").[4] The shift from defined benefit to defined contribution plans like the Plan has left a substantial retirement readiness deficit in the U.S. *See id.* at 5.

22.    On information and belief, the average ABCD worker is similar to the average U.S. worker in terms of years from retirement and lack of retirement readiness. ABCD employs workers of all ages. Most work because they need income to support themselves and their families. They do not independently have sufficient assets to support themselves through retirement. ABCD does not offer a defined benefit plan (*i.e.*, traditional pension) that guarantees income for life. The average participant's aggregate balance in ABCD's retirement program is around $130,000.[5] This

---

[3] Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds-erisa-plan-fiduciaries-tips.pdf.

[4] Available at https://www.nirsonline.org/wp-content/uploads/2024/02/FINAL-Senate-Written-Testimony-Feb-2024.pdf.

[5] ABCD has a second retirement plan in which it maintains employer contributions. The second plan is called the "pension" plan, but it is a defined contribution plan, not a defined benefit plan, and participants receive only the balance of their individual accounts. The average participant balance in the pension plan is around $50,000. The average participant balance in the Plan is around $80,000.

is insufficient for retirement. *See* PwC, "Retirement in America: Time to rethink and retool" at 4 (2021) (finding that $120,000 is "hardly enough even without factoring in rising life expectancies and increasing healthcare costs").[6]

23.    Based on the foregoing, like most retirement plan participants, participants in this Plan have a long investment horizon and need capital appreciation in order to generate more retirement income. They have a typically high tolerance for the risk associated with short-term market volatility. A prudent fiduciary would manage to the Plan's investments in a manner that ensures that participants have sufficient opportunity for capital appreciation, rather than sacrificing gains for extra volatility protection that does not comport with the Plan's goals.

### Risk and Return Characteristics of Major Asset Classes

24.    In order to maintain investments that are suited to participants' investment objectives and risk tolerances, a prudent fiduciary must understand the risk and return characteristics of different asset classes.

25.    Stocks generate the highest long-term average returns, although they exhibit the highest short-term volatility. *See* 3d Rest. § 90 cmt. l ("Historically, corporate stocks have provided greater total return over the long term than bonds but ordinarily entail higher risks[.]").

26.    Cash equivalents generate the lowest long-term average returns, but they reduce volatility risk to close to zero. *See id.* ("Returns from these investments have traditionally been relatively low, but their convenience, liquidity, and safety … are especially useful in making modest amounts of trust funds productive for limited periods of time.").

---

[6]    Available at https://www.pwc.com/us/en/industries/asset-wealth-management/assets/pwc-retirement-in-america-rethink-retool.pdf.

27.    Other assets typically fall in the middle, with the general rule being that bonds of longer duration or lower credit quality will produce higher long-term returns (albeit with higher risk) than bonds of shorter duration or higher credit equality. *See id.*

28.    Real estate generates returns close to stocks and offers potential inflation protection and reduced volatility relative to stocks. *See id.* cmt. o.

29.    A prudent fiduciary would have understood these characteristics, which have held true for more than a century. A recent study found that for 140 years, over any given 10-year period, more volatile investments in stocks and real estate consistently compensated long-term investors with higher returns.[7] *See* Òscar Jordà *et al.*, *The Rate of Return on Everything, 1870-2015*, 134 Q.J. ECON. 1225, 1241–45, 1284–85 (2019).

### *ABCD's Direction of Participant Investments*

30.    Most defined contribution plan sponsors allow plan participants to choose how to invest all of their retirement assets. ABCD instead put itself in charge. Prior to 2007, ABCD made itself responsible for directing all investments in the Plan. Participants had no choice regarding how their contributions would be invested. ABCD chose to invest 100% of the Plan's assets in a capital preservation fund, specifically an insurance company's fixed account. ABCD selected the fixed account offered by the insurance company that also performed the administrative function of maintaining the records of the Plan.

31.    The goal of insurance company fixed accounts is to protect the principal amount contributed while generating limited income. Insurance companies pay interest on contributions that is expected, over the long term, to generate returns at a level between intermediate- and short-

---

[7] The one exception appears to have been looking back 10 years from the middle of the Great Depression. *See id.* at 1285. Every other rolling 10-year period over 140 years saw a payoff for growth-oriented investments in stocks and real estate. *See id.*

term bonds. *See* Glenn Macdonald/New York Life Investments, "Stable Value: Stay the Course" at 2 (2024) (charting insurance company fixed account returns below intermediate-term bonds since 1990).[8]

32.    Accordingly, fixed accounts sit at the low end of the risk-return spectrum. A prudent fiduciary would have understood at all times that funds invested in a fixed account for long periods will earn less than investments in stocks, real estate, high yield bonds, or longer duration bonds.

33.    Additionally, a prudent fiduciary would have understood that there is no added insurance benefit of investing in a fixed account, beyond the account's fundamental risk and return characteristics. There is no death benefit for participants beyond the value of the account. The same benefit would be available for a participant's heirs and beneficiaries if the participant's account was invested in any other asset class.

34.    In 2007, ABCD partially relinquished its control over how Plan assets were invested and began allowing Plan participants to direct the investment of 25% of their new contributions to Plan.

35.    In 2008 and continuing until 2011, ABCD allowed participants to direct the investment of 50% of their new contributions to the Plan.

36.    During this period, ABCD remained responsible for directing the investment of the rest of participants' accounts. Between 2007 and 2011, ABCD continued to direct 100% of the new contributions under its control to the Plan's fixed account option. Further, ABCD did not move any of the pre-2007 funds that it had directed, and all such funds remained invested in the fixed account.

---

[8] Available at www.newyorklifeinvestments.com/assets/documents/stable-value/stay-the-course.pdf.

37.     In 2011, ABCD began allowing participants to direct the investment of 100% of their new contributions to the Plan. Again, however, ABCD retained its prior investment directions. ABCD did not apply participants' instructions regarding how to invest new contributions to the funds that ABCD had previously directed to the Plan's fixed account. All such funds remained in the fixed account.

38.     In 2019, ABCD switched the insurance company vendor that it uses to maintain the records of the Plan. At that time, ABCD terminated its fixed account contract with the outgoing vendor.

39.     ABCD's termination of the fixed account contract provided a penalty-free opportunity for ABCD to take action to remedy the misallocation of assets that resulted from ABCD's previous direction of participants' assets to the Plan's fixed account. Instead, ABCD moved the tens of millions of dollars invested in the Plan's fixed account balance to a different fixed account contract with the new insurance company. The new contract has the same investment goals as the old contract in that it provides principal protection and modest income.[9]

40.     The Plan's fixed account investments have generated long-term returns in line with the assets the account held and invested in, with returns falling between short- and intermediate-term bonds.

---

[9] The financial statements attached the Plan's annual report for 2022 filed with the Department of Labor contain an error. Note 7 states that the new contract is with Lincoln and has a minimum crediting rate of 3.00%. This appears to be language copied and pasted by the auditor from another client's financial statements and not revised to reflect the condition of the Plan. The Plan's new contract is with Great-West, not Lincoln, and there is no 3.00% guarantee. The Plan's actual rate since the switch has been consistently lower than 3.00%.

**10-Year Average Annual Returns of Major Assets Classes and ABCD Fixed Account[10]**

| 2009–2018 | 2014–2023 |
|---|---|
| U.S. Stocks<br>*13.22%* | U.S. Stocks<br>*11.40%* |
| Real Estate<br>*12.41%* | Real Estate<br>*7.69%* |
| High Yield Bonds<br>*11.12%* | High Yield Bonds<br>*4.60%* |
| Long-Term Bonds<br>*7.40%* | International Stocks<br>*4.32%* |
| International Stocks<br>*6.24%* | Long-Term Bonds<br>*3.88%* |
| Intermediate-Term Bonds<br>*4.84%* | Intermediate-Term Bonds<br>*2.46%* |
| **Plan Fixed Account**<br>*3.31%* | **Plan Fixed Account**<br>*2.42%* |
| Short-Term Bonds<br>*1.52%* | Short-Term Bonds<br>*1.27%* |
| Cash Equivalents<br>*0.37%* | Cash Equivalents<br>*1.25%* |

*Imprudent Asset Allocation*

41.     The result of ABCD's retention of the subject funds in a capital preservation account is that the Plan is grossly overallocated to assets at the low end of the risk-return spectrum.

42.     Participants' direction of one-quarter of their new contributions starting in 2007, half of their new contributions starting in 2008, and all of their new contributions starting in 2011 has slowly reduced the Plan's overall allocation to the fixed account, but the Plan's total

---

[10] Asset classes represented by the following broad-based securities indexes: U.S. Stocks – Dow Jones US Total Stock Market; High Yield Bonds – Bloomberg US Corporate High Yield; Long-Term Bonds – Bloomberg US Long Credit; International Stocks – Morgan Stanley Capital International All Country World Ex USA; Intermediate-Term Bonds – Bloomberg US Intermediate Credit; Short-Term Bonds – Bloomberg US Government/Credit 1-3 Year; Cash Equivalents – 3-Month Treasury Bill.

allocation to the fixed account remains excessive due to ABCD's failure to move the assets that it previously directed to the fixed account to new investments.

**Plan Investment Assets Allocated to the Fixed Account, 2006–2023[11]**

| Year End | Plan Investment Assets – Total | Plan Fixed Account Assets | Plan Fixed Account Allocation Percentage |
|---|---|---|---|
| 2006 | $21,069,872 | $21,069,872 | 100% |
| 2007 | $23,888,926 | $24,340,410 | 98% |
| 2008 | $26,174,793 | $25,303,579 | 97% |
| 2009 | $29,021,288 | $27,257,898 | 94% |
| 2010 | $31,331,279 | $29,010,880 | 93% |
| 2011 | $32,333,156 | $29,400,780 | 91% |
| 2012 | $32,835,084 | $28,582,791 | 87% |
| 2013 | $33,907,970 | $28,393,267 | 84% |
| 2014 | $35,134,685 | $28,355,961 | 81% |
| 2015 | $36,174,154 | $28,785,566 | 80% |
| 2016 | $37,453,767 | $29,283,855 | 78% |
| 2017 | $39,397,923 | $29,373,046 | 75% |
| 2018 | $39,174,928 | $29,716,291 | 76% |
| 2019 | $41,065,499 | $27,977,048 | 68% |
| 2020 | $43,304,685 | $28,654,764 | 66% |
| 2021 | $46,986,026 | $28,746,857 | 61% |
| 2022 | $42,390,653 | $26,568,628 | 63% |
| 2023 | $45,461,275 | $25,334,988 | 56% |

43.     In contrast, the average 403(b) plan allocation to fixed accounts is 15%–20%. *See* BrightScope/Investment Company Institute. "A Close Look at ERISA 403(b) Plans" at 33. (2024).[12]

44.     The Plan's overallocation to the fixed account comes at the expense of investment in assets that seek capital appreciation, namely stocks. The typical 403(b) plan holds between

---

[11] The Plan's most recently filed annual report concerns the Plan's financials through year-end 2023. The Plan's annual report for 2024 is not expected to be available until the second half of 2025.

[12] Available at www.ici.org/system/files/2024-04/24-ppr-dcplan-profile-403b.pdf.

60% and 65% of its assets stocks, but the Plan holds only 35% of its assets in stocks.[13] Participants in the Plans have far less opportunity for capital appreciation than they need given their retirement time horizons, and far more volatility protection than they need.

45.    Plaintiff Hildonen's experience illustrates the effect on individual participants' investments of ABCD's imprudent retention of funds in the fixed account.

46.    As of 2019, Plaintiff Hildonen was around 25 years from retirement. Given her time horizon, the consensus asset allocation for her account according to professional asset managers was 85% to 90% capital-appreciation-oriented assets (stocks, real estate) and 10% to 15% lower-risk, income-oriented assets (bonds, cash).[14] Plaintiff Hildonen's instructions

---

[13] *See id.* The average 403(b) plan allocation to stock funds is around 40%–43%, while the Plan's allocation to stock funds as of year-end 2023 was 18%. To determine the total allocation to stocks, however, balanced funds (*i.e.*, single investment options that invest in both stocks and other asset classes) must also be considered. Among the Plan's balanced funds, which comprised 24% of the Plan's assets as of year-end 2023, 70% of the underlying assets were stocks, making the Plan's total allocation to stocks 35% (18% + (24% * 70%) = 35%). In the average 403(b) plan, balanced funds comprise around 28%–31% of plan assets, of which a percentage comparable to the Plan's balanced funds (around 70%) is invested in stocks, making the total 403(b) plan allocation to stocks around 60%–65% (*e.g.*, 42% + (30% * 70%) = 63%). In 2019, the Plan's total allocation to stocks was only around 22%.

[14] Several firms produce a "target date" index that tracks how fund managers are allocating assets based on the number of years investors have left until retirement, which the firms characterize as the "consensus" asset allocation for such investors. *See* www.spglobal.com/spdji/en/documents/methodologies/methodology-sp-target-date.pdf ("Each [index] represents a consensus asset allocation[.]") & www.callan.com/target-date-index ("Callan constructed a consensus glidepath that is driven by the actual glidepaths offered within the industry."). Such allocations are intended to constitute an investor's entire account and therefore provide a benchmark for the asset allocation that professional asset managers believe is prudent at a given time based on a participant's age. As of 2019, the consensus allocation to stocks and real estate for a participant around Plaintiff Hildonen's age (anticipated retirement year 2045) was 90% according to S&P and 86% according to Callan. An academic review reached the same conclusion. *See* John B. Shoven and Daniel Walton. "An Analysis of the Performance of Target Date Funds" at 16–17. NBER Working Paper No. 27971 (October 2020) (confirming normal range of 85%-90% as of 2019 and setting the 5th percentile above 80%), *available at* www.nber.org/system/files/working_papers/w27971/w27971.pdf.

regarding how to invest her contributions were in this range—86% stocks and 14% bonds and cash. Plaintiff Hildonen did not direct any contributions to be invested in the Plan's fixed account. But because ABCD retained the funds subject to its prior direction in the fixed account, Plaintiff Hildonen's overall allocation to growth-oriented assets was only 75%, with 15% retained in the fixed account by ABCD and 10% in cash and bonds.[15] Due to ABCD's fixed account retention, Plaintiff Hildonen's account was underweight growth assets by 10% to 15% relative to the industry consensus and her instructions, limiting her opportunity for capital appreciation and reducing her ultimate distribution from the Plan.

47.    The same underallocation issue affects Plan participants closer to retirement. A long-time ABCD employee expecting to retire in 2025 who directed their contributions to the Plan's balanced fund that is specifically designed for 2025 retirees would have around 40% of their participant-directed assets invested in stocks. However, as described *supra* in paragraphs 30 to 37, ABCD directed either all or most of pre-2012 contributions to the fixed account, and thus the fixed account would likely make up a significant portion of the overall balance of that participant's account. If 60% of the account is pre-2012 contributions directed by ABCD, then the participant's aggregate allocations to stocks would be only 16%, and the participant would be underweight growth assets by 24% relative to the industry consensus asset allocation and their instructions.[16]

---

[15] Plaintiff Hildonen's instructions called for 14% of contributions to be invested in bonds and cash, but the percentage of current value associated with those contributions was lower than 14% because her contributions invested in stocks appreciated more quickly in value, shifting the total account value ratio toward stocks and reducing the percentage of value attributable to bonds and cash to around 10%.

[16] The current consensus allocation to stocks and real estate for a 2025 retiree is around 40% to 45%. The Plan's target date option for a 2025 retiree is a fund managed by JPMorgan, which is consistent with the consensus allocation.

48.     An ABCD employee who left the organization prior to having the opportunity to direct the investment of their contributions (or any significant amount of them) but left their account in the Plan also suffers reduced investment earnings. Even if such a participant is now retired, a 100% allocation to the fixed account at ABCD's direction is underweight stocks and real estate by around 40% relative to the industry consensus.

49.     The Plan's overall underweighting of stocks is the sum of such individual underweightings. At all times, ABCD has failed to bring participant account investments in line with prudent asset allocation practices and participants' time horizons and needs.

### *Losses to the Plan*

50.     ABCD's underweighting of participant accounts to capital appreciation investments has had predictable results: of the thousands of 403(b) plans offered by American employers, the Plan's performance is among the very worst.

**Average Annual Plan Returns Among 403(b) Plans, 2019–2023[17]**

|  | **Average Annual Return, 2019–2023** |
|---|---|
| **Top 1%** | 11.45% |
| **Top 10%** | 10.04% |
| **Median** | 8.76% |
| **Mean** | 8.76% |
| **Bottom 10%** | 7.52% |
| **Bottom 1%** | 5.76% |
| **The Plan** | **4.99%** |

51.     The standard deviation from the mean average annual return during the 2019–2023 period was 1.18%. The Plan's average annual return was 3.19 standard deviations below

---

[17] Includes all 403(b) type plans (designated by benefit code 2L or 2M on IRS/DOL Form 5500) that (1) filed their 2023 Form 5500 on or before October 24, 2024; (2) use a January 1 to December 31 plan year; (3) filed a long form financial schedule (Schedule H to Form 5500) in each year 2019–2023; (4) had more than zero assets at the start of the period (January 1, 2019) and at the end of the period (December 31, 2023); and (5) maintained the same employer identification number in each year 2019–2023. There are 3,932 such plans.

the mean. Because investment portfolio return levels are determined by asset allocation,[18] the relatively low standard deviation among 403(b) plans' average annual returns demonstrates that plan asset allocations are clustered closely around the average asset allocation (*see supra* ¶¶ 43–44). And at 3.19 standard deviations below the mean, the Plan's average annual return is an extreme outlier resulting from the Plan's sharp departure from the typical asset allocation (*see supra* ¶¶ 42–43).

52.     The Plan's underperformance relative to the average 403(b) plan has cost participants as a class more than $10 million in lost earnings since the start of 2019.

53.     The demographic makeup and risk tolerance of Plan participants is not to blame. In fact, the Plan would be underweight growth-oriented assets even if every participant in the Plan was 65 or older. But the Plan's participants are not all retired. The Plan's participants have a typical range of needs for capital appreciation, and the Plan's earnings should by consistent with the average 403(b) plan. Instead, the Plan is consistently generating returns worse than 99% of all 403(b) plans because ABCD has failed to prudently manage the Plan.

## PLAINTIFFS' LACK OF ACTUAL KNOWLEDGE

54.     Until shortly before filing this action, Plaintiffs lacked knowledge of material information to support their claims. Among other things, they lacked knowledge of the asset allocations and earnings of typical 403(b) plans relative to the Plan and the industry consensus asset allocation for their accounts as a whole. They also lack actual knowledge of ABCD's process for monitoring the Plan, which is known only to ABCD prior to discovery. Plaintiffs' allegations are based on inferences drawn from the facts adduced to date and are made upon information and belief and in reliance on the investigation of counsel.

---

[18] *See* Roger G. Ibbotson & Paul D. Kaplan, *Does Asset Allocation Policy Explain 40, 90, or 100 Percent of Performance?,* 56 FIN. ANALYSTS J. 1, 26–33 (January/February 2000).

**PLAN-WIDE RELIEF**

55.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek recovery on behalf of the Plan pursuant to this statutory provision.

56.     Plaintiffs seek recovery for injuries to the Plan sustained as a result of fiduciary breaches and seeks equitable relief on behalf of the Plan a whole pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

57.     Plaintiffs are adequate to bring this derivative action on behalf of the Plan, and their interests are aligned with other participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action. Plaintiffs have retained counsel experienced in ERISA litigation and intend to pursue this action vigorously on behalf of the Plan.

**CLASS ACTION ALLEGATIONS**

58.     Plaintiffs additionally and alternatively seek certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

59.     Plaintiffs asserts their claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All Plan participants who had a non-participant directed fixed account balance in Plan at any time since the date that is six years prior to the filing of this action, and their beneficiaries and alternate payees.

60.     Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan has more than 500 participants, and between 55% and 70% of the Plan's assets were invested in the fixed account during the class period.

61.    <u>Typicality</u>: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs were Plan participants and Plaintiffs suffered injuries as a result of ABCD's violations of ERISA. ABCD treated Plaintiffs consistently with other Class members with regard to the Plan. ABCD's improper actions affected all Plan participants similarly.

62.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

63.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

      a.    Whether ABCD was a fiduciary with respect to the Plan and the scope of ABCD's fiduciary duties;

      b.    Whether ABCD failed to comply with the ERISA fiduciary standards of prudence in violation of 29 U.S.C. § 1104(a)(1);

      c.    The proper form of equitable and injunctive relief; and

      d.    The proper measure of monetary relief.

64.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against ABCD would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for ABCD.

65.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court would be dispositive of the interests of all participants.

66.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. ABCD's conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against ABCD, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning ABCD's actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

67.    Plaintiffs and their undersigned counsel will provide notice to the Class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

### COUNT I

### 29  U.S.C. § 1104(a)(1)

68.    Plaintiffs incorporate the foregoing paragraphs by reference.

69.    ABCD is the Plan fiduciary responsible for monitoring Plan investments.

70.     ABCD violated ERISA fiduciary standards set forth in 29 U.S.C. § 1104(a)(1) by failing to bring the Plan's investments in line with prudent asset allocation practices and participants' time horizons and needs from 2019 to the present. ABCD retained substantial non-participant directed investments in a fixed account and failed to move those funds to different investments that would comport with the Plan's objectives and risk tolerance.

71.     ABCD's violation of 29 U.S.C. § 1104(a)(1) caused the Plan injury in the form of lost investment earnings, and ABCD's deficient fiduciary conduct threatens future harm to the Plan of the same character. These injuries to the Plan adversely affected Plaintiffs' accounts in the Plan.

72.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiffs, the Plan, and the Class are entitled to recover losses caused by ABCD's violation of 29 U.S.C. § 1104(a)(1) and other equitable and injunctive relief.

### **PRAYER FOR RELIEF**

73.     Wherefore, Plaintiffs pray for judgment against ABCD and for the following relief:

A.     Certify Plaintiffs' authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

B.     Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiffs as class representatives, and certify their counsel as class counsel;

C.     Order ABCD to make good to the Plan all losses resulting from its violations of ERISA;

D.     Impose equitable and injunctive relief sufficient to protect Plan participants,

including changes to ABCD's investment process and/or appointment of independent investment advisors and managers;

E.    Award Plaintiffs reasonable attorneys' fees and costs incurred pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

F.    Award prejudgment and post-judgment interest; and

G.    Award such other and further relief as the Court deems just and equitable.

Respectfully submitted,

Dated: January 16, 2025

**BLOCK & LEVITON, LLP**

/s/ Jason M. Leviton
Jason M. Leviton (BBO #678331)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone: 617-398-5600
jason@blockleviton.com

**ENGSTROM LEE LLC**

Mark E. Thomson, MN Bar No. 0398260*
Carl F. Engstrom, MN Bar No. 0396298*
323 N Washington Ave., Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
Facsimile: (612) 677-3050
mthomson@engstromlee.com
cengstrom@engstromlee.com
*pro hac vice application forthcoming*

*Counsel for Plaintiffs*